PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No.  09-2793

UNITED STATES OF AMERICA

v.

LUKE GATLIN,
              Appellant

Appeal from the United States District Court
for the District of Delaware
(D.C. Criminal Action No. 1-06-cr-00028-001)
District Judge: Honorable Gregory M. Sleet

Argued March 24, 2010

Before: RENDELL, AMBRO, and FUENTES, <u>Circuit Judges</u>

(Opinion filed: June 15, 2010)

Robert D. Goldberg, Esquire (Argued)
Biggs & Battaglia
921 Orange Street
P.O. Box 1489
Wilmington, DE   19899

          Counsel for Appellant


Seth M. Beausang (Argued)
Ilana H. Eisenstein, Esquire
Office of the United States Attorney
1007 North Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899

          Counsel for Appellee

_____

OPINION

_____

AMBRO, Circuit Judge

Appellant Luke Gatlin was convicted of one count of possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). On appeal, he argues that the District Court erred in denying his motions that sought (1) to suppress the evidence of the gun, (2) to compel disclosure of the

identity of the confidential informant involved in his case, and (3) a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c). We affirm the District Court's rulings in each instance.[1]

## I.

On February 9, 2006, at around 7:00 p.m., Wilmington Police Detective Joseph Leary received a phone call from a known and reliable confidential informant telling him that a man was walking in the area of 30th and Market Streets in Wilmington with a gun in his front right coat pocket. The informant described this individual as a "light skinned black male, approximately five foot eight, wearing a Chicago Cubs hat, a black hooded jacket and black blue jeans." Detective Leary then called police dispatch to have this message relayed to any officers in that vicinity.

Delaware Probation and Parole Officer Brian Kananen and Wilmington Police Detective Joshua Burch responded to this call and went to the corner of 30th and Market Streets. When they arrived, there were between 15 and 30 people at the intersection and, though the sun had already set, the area was well-lit. Among this crowd, the officers spotted a man wearing a Cubs hat who matched the informant's description standing at

---

[1]The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291.

the passenger window of a red Jeep Grand Cherokee. The officers got out of their patrol car, Detective Burch drew his gun and ordered the man down on the ground, and Officer Kananen handcuffed the man behind his back. The latter then patted the man down for weapons, and found a handgun in his right front coat pocket. At that point, Officer Kananen recognized the individual as Luke Gatlin, based on previous interactions with him in the Delaware probation system.

Gatlin was arrested and charged as noted above. Before his trial, Gatlin moved to suppress the evidence of the gun, arguing that the officers lacked reasonable suspicion to stop and search him based solely on the informant's tip that he was carrying a concealed handgun. The District Court denied the motion because it is a crime in Delaware to carry a concealed deadly weapon without a license. 11 Del. C. § 1442.[2]

Gatlin also moved pre-trial to reveal the identity of the confidential informant based on a justification defense theory. Gatlin asserted that, shortly before the tip was made, he had been robbed at gunpoint and managed to wrest the gun away from his robber. If the informant were the same person as the robber, he argued, this would buttress his defense theory. The

_____

[2]11 Del. C. § 1442 provides that "[a] person is guilty of carrying a concealed deadly weapon when the person carries concealed a deadly weapon upon or about the person without a license to do so as provided by § 1441 of this title."

District Court denied this motion, finding that this theory was too attenuated to defeat the Government's privilege to conceal the informant's identity.

Gatlin was found guilty after a jury trial. He then moved for a judgment of acquittal, under Federal Rule of Criminal Procedure 29(c), arguing that the Government had failed to prove that the gun had traveled in interstate commerce because it had not certified one of its witnesses as an expert. The District Court denied the motion, finding that Gatlin had waived this argument by not objecting to the witness's qualifications at trial. In any event, the Court concluded that, even without this witness's testimony, there would still be sufficient evidence to support the jury's verdict.

## II.

### A.    Motion to Suppress

Gatlin first argues that the District Court erred in denying his motion to suppress the handgun. Specifically, he claims that the tip did not indicate he was engaged in criminal activity because it contained no information about whether he was licensed to carry a concealed weapon. He contends further that the police had no basis to search him for weapons because, although they had reason to believe he was armed, they had no reason to believe he was dangerous.

We review the District Court's denial of Gatlin's motion to suppress "'for clear error as to the underlying facts, but exercise plenary review as to its legality in light of the court's properly found facts.'" *United States v. Lafferty*, 503 F.3d 293, 298 (3d Cir. 2007) (*quoting United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)).

A brief, investigatory stop is valid under *Terry v. Ohio*, 392 U.S. 1 (1968), "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (*citing Terry*, 392 U.S. at 30). In determining whether there was reasonable suspicion, we consider the totality of the circumstances. *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (*citing United States v. Sokolow*, 490 U.S. 1, 8 (1989)). When the officer has "reason to believe that he is dealing with an armed and dangerous individual," he may then conduct "a reasonable search for weapons for the protection of the police officer." *Terry*, 392 U.S. at 27. The purpose of a *Terry* frisk for weapons "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972). The stop and the search are independent actions, and each requires its own justification. *Arizona v. Johnson*, 129 S. Ct. 781, 784 (2009) ("First, the investigatory stop must be lawful. . . . Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous."). If the lawful bounds marked by *Terry* are exceeded, any evidence obtained

6

from the stop or the weapons search must be suppressed. *United States v. Johnson*, 592 F.3d 442, 447 (3d Cir. 2010).

1. *The Investigatory Stop*

Because it is undisputed that the tip here was reliable, the first question before us is whether the officers had reasonable suspicion to stop Gatlin based solely on the information that he was carrying a concealed handgun. This case is different from most, in that it lacks other factors often present (in addition to a tip) that suggest the defendant was engaged in criminal activity (*e.g.*, presence late at night in a high-crime area known for shootings, or attempting to flee from the police, *see Valentine,* 232 F.3d at 356–57). Nonetheless, we hold that reasonable suspicion existed in this case based solely on the reliable tip from a known informant because carrying a concealed handgun is presumptively a crime in Delaware. While it is possible to have a concealed handgun license, "[t]he burden is upon the defendant to establish that he had a license to carry [the] concealed . . . weapon." *Lively v. State*, 427 A.2d 882, 884 (Del. 1981) (*quoting Modesto v. State*, 258 A.2d 287, 288 (Del. Super. Ct. 1969)); *see also Upshur v. State*, 420 A.2d 165, 169 (Del. 1980) (stating that "the clear import of [Delaware law] . . . places the burden of proving that he was legally entitled to carry the deadly weapon (by virtue of a license) on the defendant"). Thus, under Delaware law, carrying a concealed handgun is a crime to which possessing a valid license is an affirmative defense, and an officer can presume a subject's possession is not

7

lawful until proven otherwise. *See Lively*, 427 A.2d at 884.

This presumption under Delaware law distinguishes Gatlin's case from our decision in *United States v. Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000), in which we held that a stop-and-frisk based solely on a tip that an individual had a firearm violated *Terry*. While *Ubiles* presented similar facts (in that the only evidence was a tip of firearm possession), the case arose in the U.S. Virgin Islands, which, unlike Delaware, does not apply a presumption of illegality. Instead, there it is the *Government's* burden to prove the absence of a license. *United States v. McKie*, 112 F.3d 626, 630 (3d Cir. 1997). Thus, the tip did not supply reasonable suspicion that criminal activity was afoot because it provided evidence of what is presumptively a legal activity—possession of a handgun. In other words, this tip was no different than "if [the informant] had told the officers that Ubiles possessed a wallet, a perfectly legal act in the Virgin Islands, and the authorities had stopped him for this reason." *Ubiles*, 224 F.3d at 218.

In contrast, it is presumed in Delaware that concealed handgun bearers are violating the law. 11 Del. C. § 1442. When (i) a reliable tip is received that a person is carrying a concealed firearm, and (ii) that conduct is presumed to be a crime (as it is in Delaware), an investigatory stop is within the bounds of *Terry*. That the suspect might later offer a license as an affirmative defense does not affect this analysis.

8

Here, the officers had reasonable suspicion that criminal activity was afoot based on the tip that someone matching Gatlin's description was at that very moment committing a crime—carrying a concealed firearm. Therefore, the investigatory stop of Gatlin was justified.

### 2.     *The Limited Weapons Search*

Stopping Gatlin was a proper police act under <u>Terry</u>. Moreover, because the officers believed Gatlin to have a firearm, they were permitted by *Terry* to conduct a limited search for weapons.[3]  During a lawful stop, if the officer "has reason to believe that he is dealing with an armed and dangerous individual," he may conduct "a reasonable search for weapons for the protection of the police officer." *Terry*, 392 U.S. at 27. As noted above, because the "purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence," the frisk (so long as it is conducted pursuant to a lawful stop) may be permissible "whether or not carrying a concealed weapon violate[s] any applicable state law." *Adams*, 407 U.S. at 146.

\*     \*     \*     \*     \*

---

[3]While we are concerned by the manner in which the search was conducted—at gunpoint, ordering Gatlin to the ground, and then handcuffing him behind his back before even asking him a single question—this issue is not before us on appeal.

9

As both the stop and limited search of Gatlin were constitutionally proper, we conclude that the District Court did not err in denying his motion to suppress.

## B.    Confidential Informant's Identity

Gatlin argues that the identity of Detective Leary's informant is central to his defense.  He suspects that the informant might be the same individual, Daquon Anderson, who allegedly robbed him at gunpoint shortly before his (Gatlin's) arrest at 30th and Market Streets.  If the police revealed the informant's identity and validated this suspicion, Gatlin argues this would lend credence to his defense theory.

"We review the District Court's refusal to order disclosure of [a] confidential informant's identity for abuse of discretion." *United States v. Johnson*, 302 F.3d 139, 149 (3d Cir. 2002).  While the Government has a privilege to withhold the identity of confidential informants, a "defendant can overcome this privilege if he demonstrates that disclosure 'is relevant and helpful to [his] defense' or 'is essential to a fair determination' of his guilt."  *Id.* (*quoting Roviaro v. United States*, 353 U.S. 53, 60–61 (1957)) (alteration in original).

Gatlin did not carry his burden of demonstrating that disclosure was relevant to his defense; rather, his defense theory merely indicated a hope that the informant's identity would be helpful.  *See United States v. Brown*, 3 F.3d 673, 679 (3d Cir.

10

1993) ("A defendant who merely hopes (without showing a likelihood) that disclosure will lead to evidence supporting suppression has not shown that disclosure will be 'relevant and helpful to the defense . . . or is essential to a fair determination' of the case." (*quoting Roviaro*, 353 U.S. at 60–61)). Even if Anderson were revealed as the informant, this would not prove that Anderson had robbed Gatlin and that the latter had obtained the handgun while defending himself in that robbery. Accordingly, we conclude that the District Court did not abuse its discretion in denying Gatlin's motion to disclose the informant's identity.

**C.     Sufficiency of the Evidence**

Gatlin argues that the Government, by relying on the testimony of an ATF agent who was not certified as an expert, failed to establish an element of the crime of unlawful possession of a firearm by a felon—namely, that Gatlin's handgun had traveled in interstate commerce. "In reviewing a jury verdict for sufficiency of the evidence, we must consider the evidence in the light most favorable to the government and affirm the judgment if there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt." *Brown*, 3 F.3d at 680 (internal quotation marks omitted).

Here, even without the testimony of the ATF Agent, there was substantial evidence from which the jury could have found

11

that the gun had traveled in interstate commerce: the gun was marked with a "Miami, Florida" engraving and the manufacturer's name, the ATF database indicated that the gun had been purchased in Virginia, and no handguns have been manufactured in Delaware in nearly 100 years.

\* \* \* \* \*

For the reasons discussed above, we affirm the District Court's rulings.